## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DORIS RACHER, ) | |
| SANDRA CISPER, and ) | |
| EARLENE ADKISSON, Co-Personal ) | |
| Representatives of the ESTATE OF ) | |
| ERYETHA MAYBERRY, ) | |
| DECEASED; and ) | |
| JAMES KINGSBURY, Personal ) | |
| Representative of the Estate of and Next ) | |
| of Kin to Rachel Mary Kingsbury, ) | |
| Deceased, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. CIV-13-665-M |
| ) | |
| RON LUSK, an individual, ) | |
| WESTLAKE MANAGEMENT ) | |
| COMPANY, a Texas Corporation; and ) | |
| WESTLAKE NURSING HOME ) | |
| LIMITED PARTNERSHIP, an ) | |
| Oklahoma limited partnership, formerly ) | |
| d/b/a Quail Creek Nursing and ) | |
| Rehabilitation Center, ) | |
| ) | |
| Defendants. ) | |

### ORDER

Before the Court is defendant Ron Lusk's ("Lusk") Motion to Dismiss Plaintiffs' Complaint, filed July 18, 2013. On August 8, 2013, plaintiffs filed their objection, and on August 15, 2013, Lusk filed his reply. Also before the Court is defendant Westlake Nursing Home Limited Partnership's ("Westlake") Motion to Dismiss Plaintiffs' Complaint, filed August 8, 2013. On August 28, 2013, plaintiffs filed their objection, and on August 30, 2013, Westlake filed its reply. Finally, before the Court is defendant Westlake Management Company's ("Westlake Management") Motion to Dismiss Plaintiffs' Complaint, filed August 1, 2013. On August 22, 2013, plaintiffs filed their objection, and on August 29, 2013, Westlake Management filed its reply.

I.     Background

On June 26, 2013, plaintiffs filed the instant action against defendants alleging that plaintiffs are creditors of Westlake and that defendants fraudulently transferred funds from the sale of Quail Creek Nursing Home ("Nursing Home"). Plaintiffs Doris Racher, Sandra Cisper, and Earlene Adkisson ("Mayberry plaintiffs") are the co-personal representatives of the estate of Eryetha Mayberry, deceased. Ms. Mayberry was a resident at the Nursing Home from November 14, 2008 to July 16, 2012. On or about April 16, 2012, two employees of the Nursing Home physically and verbally abused Ms. Mayberry. On April 15, 2013, the Mayberry plaintiffs commenced litigation against defendants based upon the abuse of Ms. Mayberry.

Plaintiff James Kingsbury ("Kingsbury plaintiff") is the personal representative of the estate of and next of kin to Rachel Mary Kingsbury, deceased. Ms. Kingsbury was a resident at the Nursing Home from September 27, 2005 to September 14, 2006. Ms. Kingsbury died on September 14, 2006, when she choked to death allegedly as a result of Nursing Home staff negligently feeding Ms. Kingsbury an improper diet of food she could not swallow. On September 12, 2008, Kingsbury plaintiff commenced litigation against Westlake for its alleged negligence.

During the time Ms. Mayberry and Ms. Kingsbury were residents at the Nursing Home, the Nursing Home was owned by and licensed to Westlake. Westlake is an Oklahoma Limited Partnership. Westlake Management is the general partner of, and owns approximately 10% of, Westlake. Westlake Management is a Texas corporation. Lusk is the president and director of Westlake Management. Lusk owns 100% of Westlake Management and owns approximately 90% of Westlake. Lusk is a Texas resident.

At the time Ms. Mayberry and Ms. Kingsbury were residents at the Nursing Home, the Nursing Home was operated, managed, and controlled by Westlake Management, through its president, director, and owner Lusk. Further, at the time Ms. Mayberry and Ms. Kingsbury were residents at the Nursing Home, Westlake and Westlake Management failed to carry liability insurance for injuries caused to residents by negligence or abuse at the Nursing Home.

In early 2012, Lusk was contacted by representatives of Adcare Property Holdings, LLC ("Adcare") regarding its desire to purchase the Nursing Home. In March 2012, Westlake entered into an agreement to sell the Nursing Home to Adcare for the sum of $5.8 million. Lusk signed the sales agreement in Texas and sent the documents to Adcare's Georgia counsel. Net proceeds of the sale were approximately $2.8 million. The sale proceeds were transferred from Atlanta, Georgia to Westlake Management's bank account at the Mutual of Omaha Bank in Dallas, Texas.

Defendants have now moved to dismiss plaintiffs' Complaint. Specifically, Lusk moves, pursuant to Federal Rule of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6), to dismiss plaintiffs' Complaint for (1) lack of personal jurisdiction, (2) insufficient service of process, and (3) failure to state a claim upon which relief may be granted. Westlake moves, pursuant to Rule 12(b)(5) and 12(b)(6), to dismiss plaintiffs' Complaint for insufficient service of process and failure to state a claim upon which relief may be granted. Westlake Management moves, pursuant to Rule 12(b)(2) and 12(b)(6), to dismiss plaintiffs' Complaint for lack of personal jurisdiction and failure to state a claim upon which relief may be granted.

II.   Personal Jurisdiction

Both Lusk and Westlake Management contend that this Court lacks personal jurisdiction over them. When a court's jurisdiction is contested, the plaintiff has the burden of proving that jurisdiction exists. *See ASAT Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). "Where a district court considers a pre-trial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id.* at 1056-57.

> To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process. Because Oklahoma's long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry.

*Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (internal citations omitted).

> The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant so long as there exist minimum contacts between the defendant and the forum State. The "minimum contacts" standard may be met in two ways. First, a court may, consistent with due process, assert specific jurisdiction over a non-resident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. When a plaintiff's cause of action does not arise directly from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state.

*Id.* (internal quotations and citations omitted).

> A specific jurisdiction analysis involves a two-step inquiry. First [a court] must consider whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate

> being haled into court there. Second if the defendant's actions create sufficient minimum contacts, [a court] must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice.

*Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (internal quotations and citations omitted). "A defendant's contacts are sufficient if the defendant purposefully directed its activities at residents of the forum, and . . . the plaintiff's claim arises out of or results from actions by the defendant *himself* that create a substantial connection with the forum state." *Id.* at 1076 (internal quotations and citation omitted) (emphasis in original). Further, whether a defendant has the required minimum contacts must be decided on the particular facts of each case. *See id.*

Additionally, the United States Supreme Court set forth an "effects" test in *Calder v. Jones*, 465 U.S. 783 (1984).

> Under *Calder*, an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.

*Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400 (5th Cir. 2009) (internal quotations and citation omitted). "Thus, [t]he key to *Calder* is that the effects of an alleged intentional tort are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum." *Id.* (internal quotations and citation omitted) (emphasis in original). However, a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor does not *ipso facto* establish personal jurisdiction in the state where a complaining creditor resides. *See id.* "The 'effects' test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident." *Id.*

Having carefully reviewed plaintiffs' Complaint, as well as the parties' submissions, the Court finds that it does have personal jurisdiction, particularly specific personal jurisdiction, over Lusk and Westlake Management. Based upon Lusk and Westlake Management's purported intentional tortious conduct alleged in plaintiffs' Complaint – the fraudulent transfer of the proceeds of the sale of the Nursing Home from Westlake to Lusk and Westlake Management with the intent to leave Westlake with no remaining assets or other property to satisfy plaintiffs' claims – coupled with the fact that the Nursing Home is located in Oklahoma and prior to the sale, the Nursing Home was operated, managed, and controlled by Lusk and Westlake Management, the Court finds both Lusk and Westlake Management should have reasonably anticipated being haled into court in Oklahoma. While operating the Nursing Home, Lusk and Westlake Management invoked the benefits and protections of the State of Oklahoma and through its management role with respect to Westlake, Lusk and Westlake Management created debtor and creditor relationships with residents of Oklahoma. Assuming plaintiffs' allegations are true, as the Court must at this stage of the proceedings, the Court finds Lusk and Westlake Management's alleged intentional conduct of fraudulently transferring the proceeds of the sale of the Nursing Home clearly was directed at those Oklahoma creditors.

Additionally, the Court finds that exercising specific personal jurisdiction over Lusk and Westlake Management does not offend traditional notions of fair play and substantial justice. In reaching this conclusion, the Court has considered the following five factors: (1) the burden on Lusk and Westlake Management, (2) Oklahoma's interest in resolving the dispute, (3) plaintiffs' interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in

furthering the fundamental substantive social policies. *See Intercon*, 205 F.3d at 1249. The Court specifically finds that any burden placed on Lusk and Westlake Management by proceeding in Oklahoma is minimal at best. Second, the Court finds that Oklahoma has a manifest interest in resolving the instant dispute. Lusk and Westlake Management were, prior to the sale of the Nursing Home, operating and managing an Oklahoma nursing home, and plaintiffs' underlying claims relate to the Oklahoma nursing home's alleged negligence to Oklahoma residents. The Court finds that Oklahoma would clearly have an important interest in providing a forum in which its residents can seek redress for the intentional injuries caused by out-of-state actors who allegedly, through a fraudulent transfer, sought to leave tort creditors without a means to collect any judgment they might obtain. Third, the Court finds plaintiffs' interest in receiving convenient and effective relief is great, as they are individuals with limited resources. Fourth, in terms of efficiency, the Court finds that it is not efficient for plaintiffs to have to chase Lusk and Westlake Management to Texas in these circumstances. Finally, the Court finds that the states share an interest in enforcing statutes that allow tort creditors, even those who have not obtained a judgment, to efficiently collect any judgment they might receive and avoid fraudulent transfers aimed at frustrating that goal.

Accordingly, the Court finds that plaintiffs' Complaint should not be dismissed as to Lusk or Westlake Management for lack of personal jurisdiction.

### III.   Service of Process

Both Westlake and Lusk contend that plaintiffs' Complaint should be dismissed against them for insufficient service of process. A plaintiff has the burden of establishing the validity of the service of process. *See Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992). Federal Rule of Civil Procedure 4 permits service of a summons and complaint upon

an individual by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). The same method may be used to serve a corporation. Fed. R. Civ. P. 4(h)(1)(A). Further, the Oklahoma Supreme Court has held that strict compliance with the Oklahoma statutory scheme is not required for service to be proper and "that the Oklahoma Pleading Code requires substantial compliance in order for the trial court to have jurisdiction over the person of the defendant." *Graff v. Kelly*, 814 P.2d 489, 495 (Okla. 1991).

  A.  Westlake

  On or about July 17, 2013, between 9:00 a.m. and 9:30 a.m., an unknown woman came to the Nursing Home with an envelope. Donna Heatherly, who works in Human Resources for the Nursing Home and who previously worked at the Nursing Home when Westlake owned the Nursing Home, was called out of a meeting to sign for the envelope. Ms. Heatherly asked if she "needed to sign for the envelope." The woman said that Ms. Heatherly did not need to sign for anything, but that she needed to deliver an envelope to Ms. Heatherly and then mail a copy to Lusk.

  Oklahoma law provides that personal service on a corporation is achieved by delivering a copy of the summons and petition "to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant." Okla. Stat. tit. 12, § 2004(C)(1)(c)(3). Westlake contends that plaintiffs' attempt at service does not substantially comply with these requirements. Plaintiffs' proof of service filed with the Court on July 17, 2013, states that the process server served the summons on "Donna Heatherly (HR Director), who is designated by law to accept service of process on behalf of (name of organization)

8

Westlake Nursing Home Limited Partnership on (date) 7/17/13." Proof of Service [docket no. 9]. Westlake contends that Ms. Heatherly is not designated by law to accept service of process on behalf of Westlake and has never been given authority to accept service for Westlake. Westlake further contends that Ms. Heatherly is not even an employee of Westlake; Ms. Heatherly has not worked for Westlake since the Nursing Home was sold and now works for the new owners of the Nursing Home. Because of this, Westlake asserts that Ms. Heatherly could not be "an officer, a managing or general agent" or "any other agent" of Westlake, and, as a result, service on Westlake was insufficient. Finally, Westlake contends that Lusk, not Ms. Heatherly, is the registered agent of Westlake and service should have been directed at Lusk and not Ms. Heatherly.

Plaintiffs contend that they properly served Westlake under the extenuating circumstances of this case. First, plaintiffs assert that Westlake failed to have a service agent in the State of Oklahoma as required by Oklahoma law. Lusk is listed as Westlake's registered agent; however, he is not a resident of the State of Oklahoma as required by Okla. Stat. tit. 54, § 500-114A(c).[1] Plaintiffs further assert that when Ms. Heatherly accepted service of process for Westlake in the Mayberry case, with no objection by Lusk, Westlake, or their counsel, Lusk effectively gave Ms. Heatherly apparent authority to accept service of process on behalf of Westlake. Plaintiffs also assert that Westlake had notice of this lawsuit when they served Ms. Heatherly, when they served Westlake's general partner Westlake Management, and when Lusk was served individually.

---

[1]Section 500-114A(c) provides:
> An agent for service of process of a limited partnership or foreign limited partnership must be an individual who is a resident of this state or a corporation, limited liability company or limited partnership formed in or authorized to do business in this state. A domestic limited partnership may be its own agent.

Okla. Stat. tit. 54, § 500-114A(c).

Additionally, plaintiffs assert that to the extent there was any peculiarity in the manner of service, it was a technical violation at best and as such should be ignored; after all, it was Lusk himself who created the situation by not being at the registered office and not residing in the State of Oklahoma. Finally, plaintiffs assert that should this Court determine that service was not proper, they should be permitted additional time to serve Westlake and because Westlake has no registered agent in the State of Oklahoma, this Court should order that plaintiffs can effect service of process by serving Westlake's attorney.

In its reply, Westlake contends that if the appointment of Lusk as Westlake's service agent was deficient under § 500-114A, then plaintiffs were required to serve the Secretary of State pursuant to Okla. Stat. tit. 54, § 500-117A(b).[2]  Regarding Ms. Heatherly's alleged apparent authority based upon her acceptance of service in the Mayberry case, Westlake asserts that in the Mayberry case it waived the deficiency in service of process by filing for an extension of time and that this waiver cannot be extended to the instant case. Westlake further asserts that the doctrine of "apparent authority" does not apply because there is no principal-agent relationship between Lusk and Ms. Heatherly – neither Lusk nor Westlake employ Ms. Heatherly – and because it is not reasonable for plaintiffs to believe Ms. Heatherly had "apparent authority" to accept service.

---

[2]Section 500-117A(b) provides:
> If a limited partnership or foreign limited partnership does not appoint or maintain an agent for service of process in this state or the agent for service of process cannot with reasonable diligence be found at the agent's address, the Secretary of State is an agent of the limited partnership or foreign limited partnership upon whom process, notice, or demand may be served. The Secretary of State shall charge the fee prescribed by Section 24 of this act for acting as registered agent.

Okla. Stat. tit. 54, § 500-117A(b).

10

Finally, Westlake asserts that plaintiffs have come nowhere near substantial compliance with Oklahoma's pleading code.

Having carefully reviewed the parties' submissions, the Court finds that plaintiffs have not properly served Westlake. Specifically, the Court finds that plaintiffs did not serve an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process on behalf of Westlake. The Court further finds that plaintiffs did not substantially comply with Oklahoma's law for serving summons. Ms. Heatherly does not work for Westlake but works for the entity that bought the Nursing Home; thus, the Court finds that it is not reasonable for plaintiffs to believe that Ms. Heatherly had "apparent authority" to accept service. Additionally, the Court finds any waiver of sufficient service in the Mayberry case does not apply to the instant action. However, due to the unique circumstances in this case, and particularly noting Westlake's noncompliance with Oklahoma law in that its registered agent is not a resident of Oklahoma and that Westlake received notice of this action, the Court finds that plaintiffs should be permitted additional time to serve Westlake. Accordingly, the Court finds that plaintiffs' Complaint should not be dismissed as to Westlake based upon insufficient service of process but that plaintiffs should be allowed an additional thirty (30) days to serve Westlake.

B. Lusk

On July 1, 2013, plaintiffs filed a return of service for Lusk. Included in the return of service was an Affidavit of Service by Juan Santos, plaintiffs' process server. In his affidavit, Mr. Santos states that he served Lusk's wife, Patti Talbot-Lusk, at Lusk's home address in Dallas, Texas, on the evening of June 27, 2013.

Attached to Lusk's motion to dismiss is an affidavit of Lisa Mandel. In her affidavit, Ms. Mandel states that she is a friend of Lusk's and was house sitting at Lusk's home from June 23 through June 30, 2013. Ms. Mandel states that on June 27, 2013, some time after 5:00 p.m., an individual came to Lusk's house in Texas with an envelope. According to Ms. Mandel, the following events transpired:

> I answered the door, and observed a man unknown to me. The man at the door asked me whether Mr. Lusk was here. I told him no. The man said "This is for him," and showed me an envelope. I said "I cannot accept it for him." The man said, "Well you are Ms. Lusk." I responded, "I am not. I am watching the house." The man then said, "I need to leave this." I said, "Do what you need to but I will not sign for that." The man said, "I'll leave it right here." He pointed to a 3 foot tall planter containing a potted plant sitting to the side of the front door to the house. I repeated, "Do what you need to but I will not sign for that." I then shut the door. I did not retrieve the envelope.

Affidavit of Lisa Mandel at ¶¶ 3-8, attached as Exhibit 2 to Lusk's Motion to Dismiss Plaintiffs' Complaint.

In Oklahoma, personal service is made by delivering a copy of the summons and petition to the person's house and leaving it with someone over 15 years old, who resides at the house or by delivering a copy of the summons and the petition to an authorized agent. *See* Okla. Stat. tit. 12, § 2004(C)(1)(c)(1). Lusk asserts plaintiffs have clearly failed to meet this requirement and that plaintiffs' Complaint against him should be dismissed for insufficient service of process. Specifically, Lusk states that plaintiffs attempted to serve Ms. Mandel after she informed them that she did not live at Lusk's home, she was not Mrs. Lusk, and she was watching the house. Additionally, Lusk states that the envelope containing the summons and petition was not delivered to any person but was simply left in a potted plant sitting to the side of the door. Finally, Lusk

asserts that Ms. Mandel could not be mistaken for an authorized agent of Lusk because she informed the process server that she could not accept the envelope for Lusk.  Lusk, accordingly, asserts that the alleged service on him was insufficient.

Plaintiffs contend they properly served Lusk.  Plaintiffs further contend that based upon the filing of his motion to dismiss, Lusk must have received actual and timely notice of this lawsuit and has not been prejudiced to any extent by the alleged "insufficiency of process."  Plaintiffs further assert that Lusk has not sufficiently refuted the process server's affidavit because he did not submit an affidavit from his wife swearing it was not her that was served.  Additionally, plaintiffs contend that even if Ms. Mandel was the person served, service is valid because she was residing at and in charge of Lusk's house from June 23, 2013 to June 30, 2013 and was obviously competent enough to advise Lusk that he had been served so that he could timely respond.

Having carefully reviewed the parties' submissions, the Court finds that Lusk has not been properly served.  Even assuming that Ms. Mandel could satisfy the "residing therein" requirement, the Court finds there was no proper service because the summons and a copy of the Complaint were never actually given to anyone but were simply left outside the front door of the house.  However, based upon the totality of circumstances, and in the interest of justice, the Court finds that plaintiffs should be permitted additional time to serve Lusk.  Accordingly, the Court finds that plaintiffs' Complaint should not be dismissed as to Lusk based upon insufficient service of process but that plaintiffs should be allowed an additional thirty (30) days to serve Lusk.

IV.   Failure to State a Claim

Regarding the standard for determining whether to dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the United States Supreme Court has held:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). Further, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* at 679 (internal quotations and citations omitted). Additionally, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* at 678 (internal quotations and citations omitted). Finally, "[a] court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

Defendants contend that plaintiffs have failed to plead their fraudulent transfer claim with sufficient particularity. Specifically, defendants contend that plaintiffs have not stated the "who, what, when, where" of the alleged debt owed. Defendants further contend that the Mayberry plaintiffs could not have been creditors at the time of the alleged fraudulent transfer because their lawsuit was not commenced until April 15, 2013. Likewise, defendants contend that the Kingsbury plaintiff is not yet a creditor because his disputed claims have not even gone to trial but remain pending and unproved in the District Court of Oklahoma County. Defendants assert that absent a

finding that any of the plaintiffs are a creditor of any of the defendants, plaintiffs' claims fail as a matter of law and should be dismissed.

Oklahoma's Uniform Fraudulent Transfer Act ("UFTA") sets forth the following definitions:

> "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.
> "Creditor" means a person who has a claim.
> "Debt" means liability on a claim.
> "Debtor" means a person who is liable on a claim.

Okla. Stat. tit. 24, § 113(3),(4),(5),(6). Thus, a "claim" under the UFTA may be maintained even though "contingent" and not yet reduced to judgment. Further,

> Courts deciding this issue under the UFTA have held that a "creditor" includes a person with unlitigated legal claims against the debtor. In support of this decision, courts point to the "whether or not the right is reduced to judgment" language contained in the definition of "claim." Certainly, a person holding any disputed, contingent, or unliquidated tort or contract claim has no right to enforce payment of damages until a judgment enters against the defendant. Nonetheless, this does not diminish the claim for payment of damages that the plaintiff asserts when filing a lawsuit. These courts have generally held that a debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties.

*Dominguez v. Eppley Transp. Servs., Inc.*, 763 N.W.2d 696, 703 (Neb. 2009) (internal quotations and citations omitted). *See also, Watterson v. Burnard*, 986 N.E.2d 604, 609 (Ohio 2013) (finding tort claimant becomes creditor within meaning of Uniform Fraudulent Transfer Act at the moment in which the cause of action accrues); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) ("one who has a right to maintain a tort action but has not recovered judgment at the time of

15

the transfer is a creditor, and it is now accepted that the relationship of debtor and creditor [in tort cases] arises the moment the cause of action accrues.").

Having carefully reviewed plaintiffs' Complaint, the Court finds that plaintiffs have set forth sufficient factual allegations to state a claim for fraudulent transfer against defendants. Specifically, the Court finds that plaintiffs have pled the details of the alleged fraudulent transfer of the proceeds of the sale of the Nursing Home with sufficient particularity. Plaintiffs clearly and in detail set forth the who, what, when, where, and how of the alleged fraudulent transfer. Additionally, the Court finds that plaintiffs have pled the details of the alleged debt with sufficient particularity. Both the Mayberry plaintiffs and the Kingsbury plaintiff set forth the factual basis for their allegations that they are tort claimant creditors. Finally, the Court finds that based upon the UFTA's definition of claim, as well as the case law set forth above, the factual allegations pled by plaintiffs would support a finding that plaintiffs are, in fact, creditors of defendants. Specifically, the Court finds that plaintiffs were creditors at the time of the alleged fraudulent transfer – the Mayberry plaintiffs became creditors as of April 16, 2012, the date of the alleged abuse of Ms. Mayberry, and the Kingsbury plaintiff became a creditor as of September 14, 2006, when Ms. Kingsbury choked to death.

Accordingly, the Court finds that this action should not be dismissed based upon any alleged failure to state a claim.

V. <u>Conclusion</u>

For the reasons set forth above, the Court:

(A) GRANTS IN PART and DENIES IN PART Lusk's Motion to Dismiss Plaintiffs' Complaint [docket no. 10] and GRANTS plaintiffs an additional thirty (30) days to serve Lusk;

(B)     GRANTS IN PART and DENIES IN PART Westlake's Motion to Dismiss Plaintiffs' Complaint [docket no. 15] and GRANTS plaintiffs an additional thirty (30) days to serve Westlake; and

(C)     DENIES Westlake Management's Motion to Dismiss Plaintiffs' Complaint [docket no. 14].

**IT IS SO ORDERED this 14th day of November, 2013.**

*/s/ Vicki Miles-LaGrange*
VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE